UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | No. S1-4:10CR415 HEA |
| JOVICA PETROVIC, | ) ) | |
| Defendant. | ) ) | |

# MEMORANDUM AND RECOMMENDATION
# OF UNITED STATES MAGISTRATE JUDGE

The above matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. §636(b). The Defendant filed a Motion to Dismiss Counts I-IV. The parties fully briefed the issues, and on February 4, 2011, the undersigned held a hearing on the motion to dismiss. Based upon the evidence adduced at the hearing, the undersigned makes the following findings of fact and conclusions of law:

## Offer of Proof

As part of the response to the Defendant's motion to dismiss the first four counts of the indictment, the Government proffered much of the evidence that it would prove at trial. This evidence, the Government states, shows that the Defendant used the mails and other facilities in interstate commerce to engage in a course of conduct to harass, intimidate, place in fear of bodily injury, and cause emotional distress to the victim, his ex-wife. The undersigned will accept this offer of proof for the purposes of determining the motion to dismiss. The Government alleges that it will prove the following:

The victim, M.P., was previously married to another victim, R.B., with whom she has two children. After her marriage was dissolved with R.B., M.P. married the Defendant, Jovica Petrovic in June, 2009. This relationship apparently, immediately began to sour, and at the end of December, 2009, M.P. decided to terminate her relationship and marriage with Petrovic. During the course of their brief marriage, Petrovic, without the victim's knowledge, secretly filmed sexual encounters between M.P. and Petrovic. In addition, M.P. revealed "family secrets" to Petrovic, the disclosure of which would cause considerable embarrassment to M.P., her ex-husband, R.B., and her family. Petrovic kept an electronic record of much of this embarrassing information. Shortly after M.P. informed Petrovic she was terminating their relationship, Petrovic left a message with M.P. telling her that if she did not call him in the next fifteen minutes, and if she terminated their relationship, he would reveal embarrassing details about her life, including the fact that she had been raped by the boyfriend of her mother when she was nine years old. He also told her that he had been secretly taping their sexual encounters, and that he would also place that on the internet. Petrovic also telephoned M.P. multiple times per day at her place of work, a high-end hair restoration center. He also allegedly posed as a purchaser of property where the business was located, and appeared unannounced at this building. He sent express packages to M.P.'s supervisor, at her place of business, containing multiple graphic shots of M.P. engaged in sexual relations with Petrovic, which the Government alleges were extracted from the secretly-filmed videos. In addition, on January 14, 2010, the Government alleges that Petrovic placed M.P. under surveillance, followed her home from work, and attempted to run her off the road with his vehicle. That same evening, he sent threatening text messages to R.B., including one stating that she was not worth dying for. During this time, M.P. filed for divorce from Petrovic and obtained an order of protection against Petrovic. Petrovic also

started a website using M.P.'s name, on which he posted sexually explicit pictures of M.P., which had never been revealed to the public before. These pictures included, what could only be described as, graphic, close-up, hardcore pornography of M.P. and Petrovic involved in sex acts. The website also posted numerous pictures of M.P.'s minor children and other members of her family, and pictures of M.P.'s previous husband, R.B. Petrovic also included humiliating details about M.P.'s personal life, including her prior bouts with mental illness, her suicidal tendencies, her statements about suffering sexual abuse as a child, and other embarrassing information not previously available to the general public. During May and June, 2010, Petrovic made a large number of homemade postcards which he created with computer equipment at his residence in Florida. Each picture featured a sexually suggestive picture of M.P. on one side, and contained a message on the reverse side that insulted M.P., and referred the postcard's recipient to the website Petrovic had created. Among other things, he described M.P. as "young, mentally sick slut," as "just a whore 4 sale," and as "golddigger," and as "screwed up in the head." Each one of these postcards referred the recipient to Petrovic's website which contained the graphic information detailed above. Petrovic sent these postcards to R.B.'s (her ex-husband) home, R.B.'s business, to his business partners, associates, and contractors, to M.P.'s family members, and to M.P.'s business associates. The postcards were also viewed by M.P.'s minor children when they arrived at R.B's house. Further, on June 20, 2010, Petrovic said that he would take down his website, but only "if [MP] give me my furniture, what she stoled from me, the wedding and engagement ring. . .and $100,000, what I spent for her kids and her divorce attorney, back. I would be more than glad to turn off this website."

On July 15, 2010, Petrovic was arrested on the criminal complaint in the Eastern District of Missouri. He was placed on bond, however, on September 15, 2010, while he was on pretrial release, Petrovic appeared at M.P.'s place of work, and confronted her on the parking lot. This appearance was against the orders of his bond conditions, as well as the order of protection. The Government also alleges that Petrovic's actions caused M.P. substantial emotional distress, and led to thoughts of suicide on her part. They have also caused her to fear for her life and the safety of her children, "since extraordinary effort went into the website and postcards and reveals Petrovic's persistent and frightening sexual obsession with M.P." Further, the Government alleges that they caused damage to R.B.'s business relationship with his partners, associates, and contractors.

## Conclusions of Law

A. The Defendant's publication of information about a matter not of "public concern" about a private individual.

Based on the above facts, the undersigned concludes that the publication of what could be determined as outrageous and highly offensive personal information and pornographic photographs of the victim is not protected by the First Amendment. In this regard, the undersigned concludes that the publication of the above information about a non-public figure is similar to the publication of defamatory information about a non-public figure on a matter not of public concern.

In <u>Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.</u>, 472 U.S. 749 (1984), Dun & Bradstreet circulated a false financial report to various financial institutions relating to Greenmoss's financial condition. Dun & Bradstreet told the financial institutions that Greenmoss had previously filed for bankruptcy, when, in fact, Greenmoss had never filed for bankruptcy, and was continuously in excellent financial condition for the period covered by the report. The plaintiff sued Dun & Bradstreet alleging that the defendant had defamed them, and that the false report injured the

4

business's reputation. The plaintiff asked for actual and punitive damages, and not surprisingly, the jury returned a verdict of both actual and exemplary damages. The defendant appealed this ruling, eventually to the Supreme Court, alleging that, according to the precedent of New York Times v. Sullivan, 376 U.S. 254 (1964), and Gertz v. Robert Welch, Inc., 418 U.S. 323 (1974), the plaintiff had to show actual malice before punitive damages would be allowed. In rejecting the defendant's argument, the Court drew a distinction between issues of public concern or information about public figures, and issues not of public concern about private individuals. The Court held that extraordinary First Amendment protections applied only to matters of public concern or information about public figures. In so holding, the Court stated as follows:

> . . .We have long recognized that not all speech is of equal First Amendment importance. It is speech on " 'matters of public concern' " that is "at the heart of the First Amendment's protection.". . .
>
> In contrast, speech on matters of purely private concern is of less First Amendment concern. *Id.,* at 146-147, 103 S.Ct. at 1689-1690. As the number of state courts, including the court below, have recognized, the role of the constitution in regulating state libel law is far more limited when the concerns that activated *New York Times* and *Gertz* are absent. . .
>
> While such speech is not totally unprotected by the First Amendment, see *Connick v. Myers, supra*, 461 at 147, S.Ct. at 1690, its protections are less stringent. . .The rationale of the common-law rules has been the experience and judgment of history that "proof of actual damages will be impossible in a great many cases where, from the character of the defamatory words and the circumstances of publication, it is all but certain that serious harm has resulted in fact.". . .As a result, courts for centuries have allowed juries to presume that some damage occurred from many defamatory utterances and publications. . .This rule furthers the state interest in providing remedies for defamation by ensuring that those remedies are effective. In light of the reduced constitutional value of speech involving no matters of public concern, we hold that the state interest adequately supports awards of presumed and punitive damages--even absent a showing of actual malice.

Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 759, 760, 761.

Significantly, in commenting on the dissent's position that even this type of speech should be subject to special protection, the Court stated as follows:

> . . .If the dissent were the law, a woman of impeccable character who was branded a "whore" by a jealous neighbor would have no effective recourse unless she could prove "actual malice" by clear and convincing evidence. This is not malice in the ordinary sense, but in the more demanding sense of *New York Times*. The dissent would, in effect, constitutionalize the entire common law of libel.

472 U.S. 749, 761, FN 7.

The undersigned concludes that the same situation exists in the case now at bar. In the present case, outrageous or highly offensive information was intentionally published about the plaintiff to her employer, her family, her children, and to her ex-husband's business associates, yet the Defendant would hold these statements to special First Amendment protection. The undersigned concludes that similar to a woman of impeccable reputation being branded a whore by a jealous neighbor, the type of speech in the present case is not protected by the First Amendment. See also, City of San Diego v. Roe, 543 U.S. 77 (2004) (city could fire a police officer because videos of employee engaging in sexually explicit acts was not a matter of public concern); Snyder v. Phelps, 131 S.Ct. 1207 (March 02, 2011) (reaffirming that non-public speech not entitled to special First Amendment protection).

Further, if, as the Government states, Coplin v. Fairfield Public Access Television Committee, 111 F.3d 1395 (8th Cir. 1997), establishes the standard for determining whether the type of case now at bar is subject to First Amendment protection, then the undersigned concludes that the case now at bar meets all four standards of the Coplin test. The Coplin test requires that any regulation which prohibits the revealing of truthful facts about private individuals, 1) must be viewpoint neutral; 2) the facts revealed must not already be in the public domain; 3) the facts revealed about the otherwise

private individual are not a legitimate subject of public interest, and 4) the facts revealed are highly offensive. As stated by the Government, the proffered evidence and the testimony easily passes all four tests. The statute itself is viewpoint neutral, banning stalking, harassing behavior, and the infliction of substantial, emotional distress without any reference to any viewpoint or subject matter. Further, as stated in the Government's proffer, all the facts revealed were never in the public domain, and are highly embarrassing to several individuals. Further, they were revealed to individuals in a limited fashion and to individuals guaranteed to cause the victim harm--that being the victim's ex-husband's business associates, her children, and her employer. Third, the facts are not a legitimate subject of public interest, but involve highly personal, embarrassing and confidential information and photographs of the victim. Further, by any standard, the facts revealed are highly offensive. Therefore, based on the above, the undersigned concludes that the material is not subject to protection of the First Amendment.

### B. First Amendment's Protection of Extortionate Stalking and Harassing Speech

For the reasons well stated in the Government's brief, the undersigned concludes that the First Amendment does not protect the extortionate speech and harassing conduct of the Defendant in the case now at bar. The Government alleges that, as part of the course of conduct that caused substantial emotional distress to the victim, and instilled a reasonable fear of death or serious bodily injury, the Defendant engaged in acts of extortion as well as harassment and intimidation. Therefore, the Government alleges that it will prove, in relation to Counts I - IV of the indictment, not just the highly personal information on the website and postcards, but also acts of extortion. Specifically, the Government states it will show that on December 28, 2009, the Defendant threatened to injure the victim's reputation by publishing sexually explicit and embarrassing materials about her if she

7

terminated their sexual relationship. When she failed to comply with this, he carried out his threats to injure her reputation by setting up his defamatory website and mailing out many postcards. Further, on June 20, 2010, the Government alleges that the Defendant demanded $100,000 from the victim in exchange for his agreement to take down the website. In short, the Government alleges that the Defendant tried to extort her by threatening to put up a website, then establishing the website, and then extorting her again for $100,000 to take it down. The undersigned concludes that this conduct, which the undersigned believes rightly can be introduced as part of Counts I - IV, does not come within First Amendment protection. As stated by the Government, the Supreme Court in United States v. Stevens, 130 S. Ct. 1577 (2010), confirmed the First Amendment does not protect "speech integral to criminal conduct." Id. at 1584. Further, blackmail and extortion are not constitutionally protected. United States v. Hutson, 843 F.2d 1232, 1235 (9th Cir. 1988) (extortionate speech is undoubtedly within the government's power to prohibit). See also Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 498 (1949) (holding that the picketing activities of a union were not protected by First Amendment when the union engaged in picketing activities in order to carry out threats made to pressure businesses to enter an illegal agreement in restraint of trade).

In addition, there is widespread consensus that stalking and harassing conduct may be criminalized, and that the statutes do not violate the First Amendment. See Staley v. Jones, 239 F.3d 769, 771 (6th Cir. 2001); United States v. Bowker, 372 F.3d 365 (6th Cir. 2004).

The Defendant also alleges that the four pieces of correspondence alleged to have been sent in the first four counts of the indictment should be considered in isolation. Because these four mailings relate to the jurisdictional element of the offense of stalking or harassment, the Defendant's argument in this regard must fail. The statute in pertinent part states:

8

> Whoever, with the intent. . . to cause substantial emotional distress to a person. . . uses the mail. . .or any facility of interstate or foreign commerce to **engage in a course of conduct** that causes substantial emotional distress to that person. . .

18 U.S.C. § 2261A(2)(A).

It is clear from a plain reading of the statute, that the use of the mail need not itself indicate be threatening or harassing, but that it must be part of a course of conduct that causes substantial emotional distress. In this regard, it is similar to the mail fraud statute which in pertinent part reads as follows:

> Whoever, having devised. . . any scheme or artifice to defraud, . . . for the purpose of executing such scheme or artifice. . .places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service. . . shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1341.

As to the law of mail fraud, each separate mailing in furtherance of the scheme to defraud or for the purpose of executing it, may be punished as a separate crime. The entire scheme is admissible even if only one mailing is charged, and even if that mailing is innocuous on its face, as long as the mailing is in furtherance of some essential element of the scheme. See Schmuck v. United States, 489 U.S. 705, 713 (1989) (all mailings that are in any way part of the execution of the scheme will supply the mailing element of the offense even if the mailing may later turn out to be counterproductive and allow discovery of the scheme). The same reasoning applies to the case now at bar. Therefore, the Defendant's argument must fail.

C. Facial Challenge to the Statute

As noted by the Government, any course of conduct proscribed by violation of § 2261A(2), must show that the acts or language were committed with the intent to injure, harass, or place under surveillance with intent to kill, injure, harass, or intimidate, or cause substantial emotional distress to another, and it must have the actual effect of causing substantial emotional distress to that person. Because the statute requires any course of conduct to be committed with malicious intent and harmful effect, the undersigned believes the Government is correct that the statute lies outside the protection of the First Amendment. As noted by the Government, every court to consider a facial challenge to § 2261A(2) has dismissed it. See United States v. Bowker, 372 F.3d 365, 378 (6th Cir. 2004).

**Conclusion**

Therefore, the Defendant's motion to dismiss must be denied.

∗ ∗ ∗

In accordance with the Memorandum above,

**IT IS HEREBY RECOMMENDED** that the Motion to Dismiss Counts I - IV of the Superseding Indictment [Doc. #65, Part II] be **denied**.

Further, the parties are advised that they have fourteen (14) days, in which to file written objections to this recommendation and determination. Failure to timely file objections may result in waiver of the right to appeal questions of fact. Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

                                          /s/ Terry I. Adelman
                              UNITED STATES MAGISTRATE JUDGE

Dated this  17th  day of March, 2011.